FRANCES TSOURMAS *et al.*, Plaintiffs-Appellants, v. DORA DINEFF *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 86—2843

Opinion filed September 29, 1987.

Cherry & Flynn, of Chicago (Myron M. Cherry and Bruce Rose, of counsel), for appellants.

Beverly, Pause, Duffy & O'Malley, of Chicago (Robert O. Duffy, Thomas J. Brophy, and Michael W. Rathsack, of counsel), for appellees.

JUSTICE STAMOS delivered the opinion of the court.

Plaintiffs Frances Tsourmas (Tsourmas) and Ann Yurinich (Yurinich) filed suit against several defendants for injuries that they had sustained as a result of carbon monoxide poisoning. For purposes of this appeal, however, Jack Yelnick, d/b/a Jack Yelnick Construction Company (Yelnick), is the only appellee. Yelnick filed a motion for summary judgment. On September 22, 1986, the trial court entered an order granting Yelnick's motion for summary judgment. This appeal of Tsourmas and Yurinich is taken from that order.

In 1964, Dr. William Gogan (Gogan) leased a building located at 7623 W. 63rd Street, Summit, from Christ Dineff. In order to convert the building into his medical office, Gogan had to have extensive remodeling work done. Gogan spoke to Yelnick about doing the remodeling work. Gogan wanted carpentry, electrical, decorating and plumbing work done on the building. Although Yelnick was only a concrete and carpentry contractor, Yelnick agreed to do the entire remodeling job. Yelnick had on about 20 prior occasions and on over 100 subsequent occasions arranged for other tradesmen to do work as part of the job that he was handling. In other words, Yelnick had taken on the role of general contractor many times.

Gogan and Yelnick then entered into a contract. Yelnick submitted a written proposal (dated December 23, 1964) to Gogan. The written proposal stated that for the sum of $6,750, Yelnick would complete all of the construction work (carpentry, electrical, decorating and plumbing) that Gogan had requested. The proposal also stated that if a new furnace were used there would be an additional cost of $200. Yelnick himself completed the carpentry part of the contract. Yelnick bricked up the only two windows at the rear of the building, partitioned all of the walls so as to make examining rooms, and dropped the ceiling. Yelnick hired subcontractors to do the electrical, plumbing and decorating work.

During the remodeling period, a gas forced-air heater was placed in the building. Contradictory testimony exists as to which contractor actually installed the heating system. Gogan stated that Yelnick had installed the heating system. To the contrary, Yelnick stated that a new furnace was definitely not installed, that he was not asked to install a furnace and that he does not install furnaces. Furthermore, one of Gogan's employees stated that she heard that Summit Sheet Metal Company (Summit) had installed the furnace. The trial court concluded that, based upon a fair reading of the depositions, "a new furnace was installed through Yelnick and that this furnace was installed by two men by the name of Ziomek, who operated a business called Summit

Sheet Metal."

Upon completion of the remodeling, Gogan moved into his office. In about 1967, Tsourmas, a registered nurse, began working for Gogan in his Summit office. Yurinich began working as a receptionist in the same building in 1972. While working in the building, Tsourmas, Yurinich and Gogan frequently smelled a sewer gas odor. Gogan complained several times about the odor, but nothing was ever done to eliminate it.

Beginning in 1979-80, Tsourmas and Yurinich complained to Gogan of chest pains, fast pulses and headaches. Despite their different ages and lifestyles, both Tsourmas and Yurinich experienced the same symptoms and entered the hospital within a short time of each other. Tsourmas had a mitral valve prolapse that was supposed to have been due to carbon monoxide poisoning. In addition, Tsourmas experienced fatigue, memory loss, cyanosis of the fingertips, air hunger, visual disturbances and watery, itchy eyes. Tsourmas and Yurinich were later diagnosed as having carbon monoxide poisoning. Gogan himself experienced headaches and irregular heartbeats. After talking with a Dr. O'Donohue, Gogan felt that carbon monoxide poisoning might be the cause of his symptoms.

Sometime in 1980, Gogan hired Mr. Davis (Davis) to take an analysis of the atmosphere in the building. Davis came out to the building twice. Davis gave Gogan a verbal report and then later sent Gogan a written report of his findings. Davis concluded that there were two main problems in the building that were responsible for Gogan's employees' symptoms. First, sewer gas was getting into the air return from the underground duct work. Second, the furnace had an exhaust leak that had caused an excess of carbon monoxide to go into the air. In his deposition, Gogan stated that he believed that the exhaust gas was the source of the problem and that the symptoms that his employees had experienced were obviously caused when they had ingested the carbon monoxide.

Plaintiffs-appellants, Tsourmas and Yurinich, request that the summary judgment entered for Yelnick below be reversed. The plaintiffs argue that material issues of fact exist. First, the plaintiffs argue that Yelnick is directly liable for the plaintiffs' injuries because of construction work that Yelnick had personally performed on Gogan's building. Yelnick responds that he cannot be directly liable for the plaintiffs' injuries because he was not personally involved in the installation of the furnace which is the alleged source of the plaintiffs' injuries.

Second, the plaintiffs contend that Yelnick is vicariously liable for the plaintiffs' injuries because Yelnick, as general contractor, is respon-

sible for the actions of the subcontractor who installed the heating system in Gogan's building. In reply to the plaintiffs' second contention, the defendant argues that Summit, the subcontractor who installed the furnace, was an independent contractor. Yelnick reasoned that because he did not have any authority or duty to control the conduct of Summit, Yelnick has no vicarious liability for Summit's acts and/or omissions.

The plaintiffs also argue that the trial court erroneously reduced the "knew or should have known" negligence standard to an "actual knowledge" standard. The plaintiffs are incorrect. The trial court stated that "there is no showing, no showing whatsoever on this record that Yelnick knew or by the exercise of reasonable care *should have known* that the subcontractor's work was being done in a way unreasonably dangerous to others." (Emphasis added.) This argument of the plaintiffs', therefore, has no merit.

The purpose of summary judgment is not to decide issues of fact but to determine whether any genuine issue of fact exists. (*Kobus v. Formfit Co.* (1966), 35 Ill. 2d 533, 538, 221 N.E.2d 633.) A motion for summary judgment is properly granted if the pleadings, depositions and admissions on file, together with any affidavits and exhibits, when construed strictly against the moving party and liberally in favor of the opponent (*Killeen v. R. W. Dunteman Co.* (1979), 78 Ill. App. 3d 473, 475, 397 N.E.2d 436) show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (*Fooden v. Board of Governors* (1971), 48 Ill. 2d 580, 586, 272 N.E.2d 497.) If disagreement arises as to any material fact, the court must deny the motion and set the cause for trial. (*Hernandez v. Trimarc Corp.* (1976), 38 Ill. App. 3d 1004, 1006, 350 N.E.2d 202.) A court of review will reverse an order granting summary judgment if it finds that a material question of fact is present and that the moving party is not entitled to judgment as a matter of law. *Estate of Kern v. Handelsman* (1983), 115 Ill. App. 3d 789, 793, 450 N.E.2d 1286.

In the present case, therefore, summary judgment in favor of Yelnick will be reversed if a material question of fact exists and Yelnick is not entitled to judgment as a matter of law.

An issue of material fact exists as to whether the carpentry work that Yelnick personally performed was a contributing cause of the plaintiffs' injuries. Yelnick performed carpentry work on Gogan's building. Yelnick constructed and paneled several rooms. Yelnick bricked up the only two windows at the rear of the building. Yelnick installed a dropped ceiling and wired some of the ceiling panels down.

The plaintiffs argue that the carpentry work that Yelnick per-

formed was a contributing cause of their injuries. The plaintiffs allege that Yelnick constructed a plenum into which contaminated air from the furnace was drawn and recirculated. The plaintiffs allege further that when Yelnick bricked the windows and wired down the panels, he made the building airtight, thus contributing to the carbon monoxide contamination. Whether the carpentry work that Yelnick performed was a contributing cause of the plaintiffs' injuries is a genuine issue of material fact.

■ An issue of material fact exists as to whether Yelnick had the right to control heating subcontractor Summit so as to make Yelnick vicariously liable for Summit's conduct. The general rule is that the employer of an independent contractor is not liable for the acts and/or omissions of the independent contractor. (*Pasko v. Commonwealth Edison Co.* (1973), 14 Ill. App. 3d 481, 487, 302 N.E.2d 642.) In Illinois, however, section 414 of the Restatement of Torts, Second, is a well-recognized exception to the general rule. (*Weber v. Northern Illinois Gas Co.* (1973), 10 Ill. App. 3d 625, 639, 295 N.E.2d 41, citing *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 325, 211 N.E.2d 247.) Section 414 states:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts sec. 414 (1965).

Comment A to section 414 goes on to explain that an employer with only supervisory control over an independent contractor may be held liable for the independent contractor's actions unless the employer "exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others." In Illinois, therefore, anyone who entrusts work to an independent contractor may be held liable for the acts and/or omissions of the independent contractor. See, *e.g.*, *Burns v. Howell Tractor & Equipment Co.* (1977), 45 Ill. App. 3d 838, 360 N.E.2d 377; *Pasko v. Commonwealth Edison Co.* (1973), 14 Ill. App. 3d 481, 302 N.E.2d 642; *Weber v. Northern Illinois Gas Co.* (1973), 10 Ill. App. 3d 625, 295 N.E.2d 41; *Rodgers v. Meyers & Smith, Inc.* (1965), 57 Ill. App. 2d 200, 206 N.E.2d 845; *Leatherman v. Schueler Brothers, Inc.* (1963), 40 Ill. App. 2d 56, 189 N.E.2d 10.

In *Burns*, Cook County hired Robert R. Anderson Company (Anderson) to do a road resurfacing project in Palatine, Illinois. Anderson hired the plaintiff, a machine operator, to operate a vibratory

roller. One day while operating the vibratory roller, the roller toppled over and pinned the plaintiff to the ground. The plaintiff sustained serious injuries. The plaintiff filed suit; one of the defendants was Anderson's employer, Cook County. The jury found for the plaintiff.

On appeal, Cook County contended that it should not be held liable because it had employed Anderson as an independent contractor and thus had not retained sufficient control over Anderson. (*Burns v. Howell Tractor & Equipment Co.* (1977), 45 Ill. App. 3d 838, 848, 360 N.E.2d 377.) The appellate court disagreed with Cook County's argument and then went on to state the law. "Cook County retained sufficient control of the project to be held accountable for injuries sustained during construction if it knew, or through the exercise of reasonable care should have known, that the work of Anderson was being performed in a dangerous manner, but it failed to correct such activities by exercising the power of control which it retained." (45 Ill. App. 3d 838, 848, 360 N.E.2d 377.) The court then applied the facts of the case to the law and concluded that the trial record contained enough evidence from which a jury could find that Cook County was aware of, and had an opportunity to correct, the dangerous situation which caused the plaintiff's injuries. 45 Ill. App. 3d 838, 848, 360 N.E.2d 377.

In *Pasko*, Commonwealth Edison Company (Edison) employed A. A. Electric Company (A.A.) as an independent contractor to install a series of electric poles. The plaintiff, an employee of A.A., was severely injured while he was installing one of the poles. The plaintiff filed suit and named the employer, Edison, as one of the defendants. Judgment was entered in favor of the plaintiff.

On appeal, Edison argued that A.A. was an independent contractor and that there was no evidence to show that Edison was under a duty: to provide the plaintiff with a safe place to work; to warn the plaintiff of any danger involved in the excavation operations; or to require that A.A. use safety devices. (*Pasko v. Commonwealth Edison Co.* (1973), 14 Ill. App. 3d 481, 487, 302 N.E.2d 642.) In rejecting Edison's argument, the *Pasko* court cited section 414. (14 Ill. App. 3d 481, 488, 302 N.E.2d 642.) The court stated that in its contract with A.A., Edison had the right to order the work halted if it felt that A.A. was using unsafe procedures and could prevent resumption of the work until A.A. employed the proper means and methods. (14 Ill. App. 3d 481, 489, 302 N.E.2d 642.) The court reasoned that whether Edison had retained sufficient control over the safety aspects of the project and whether Edison failed to properly exercise that control were questions of fact for the jury. In affirming the trial court's judgment against Edison, the appellate court concluded that the manifest weight of the evi-

dence was not contrary to the jury's verdict. 14 Ill. App. 3d 481, 490, 302 N.E.2d 642.

In *Weber*, Northern Illinois Gas Company (Northern) hired Lyman Construction Company (Lyman) and Geneva Construction Company (Geneva) as subcontractors to install a gas pipeline. While on the job, the plaintiff, an employee of Lyman, got his foot caught in a loop of cable. The cable tightened and the plaintiff's left leg was amputated between the ankle and knee. In the contract between Lyman and Northern, the employer, Northern was given the right to stop Lyman's work until Lyman began to use the means and methods necessary to prevent danger to people. Northern also had the right to order unsafe equipment removed and order Lyman to remove any worker that Northern felt was unfit or unskilled.

The plaintiff filed suit and in count I alleged that Northern was liable in common law negligence. (*Weber v. Northern Illinois Gas Co.* (1973), 10 Ill. App. 3d 625, 628, 295 N.E.2d 41.) The trial court subsequently entered summary judgment for Northern as to count I. The plaintiff appealed this summary judgment order. After citing section 414 and its comments in full, the appellate court concluded that the trier of fact could find that Northern met the standards of control set forth in the comments of section 414.

Northern responded that because it did not participate in the operation of the winch truck or other pipe-moving operations as a matter of law, it is not liable to the plaintiff. The *Weber* court, however, noted that Northern defined the word "participate" much too narrowly. The appellate court stated that "participate" encompasses more than physical involvement. The court cited cases wherein a general contractor was held liable for failure to warn, failure to guard against injuries, and failure to inspect. (10 Ill. App. 3d 625, 639, 295 N.E.2d 41.) The court then reversed the grant of summary judgment that was entered for Northern.

In *Rodgers*, a LaGrange school district hired general contractor Meyers and Smith, Inc. (Meyers), to raise and repave a playground area. Meyers subcontracted the work of raising and resetting three sewers and building a fourth sewer to William J. Magill, d/b/a Magill Plumbing and Heating Company (Magill). After the sewer work was completed, the plaintiff was walking to the school building when he stepped on the right side of a sewer lid and the lid tilted. The plaintiff fell and sustained injuries. The plaintiff filed suit against general contractor Meyers and against subcontractor Magill. The trial court entered judgment notwithstanding the verdict in favor of both defendants. In reversing the trial court, the appellate court held that there

was evidence in the record wherein a jury could, and in fact did, find that Meyers and Magill did not exercise ordinary care in discovering whether the old sewer cover might tilt when someone walked on it. *Rodgers v. Meyers & Smith, Inc.* (1965), 57 Ill. App. 2d 200, 208, 206 N.E.2d 845.

In *Leatherman*, Schueler Brothers, Inc. (Schueler), a general contractor, was constructing four homes for a development company. Included in his role as general contractor, Schueler furnished the carpentry work and did some other miscellaneous work on the homes. Schueler employed several independent subcontractors to do the painting, plumbing, heating and electrical work. Schueler hired Lee Eckert (Eckert), an independent contractor, to do the painting.

Eckert had just finished painting the basement steps in one of the nearly completed homes. Eckert left his bucket with a brush in it at the top of the stairway and left momentarily. The plaintiff, an employee of the Illinois Power Company, started down the basement stairs to check the gas meter installation. The plaintiff slipped on the wet paint and was injured after he fell to the bottom of the stairs. The plaintiff filed suit against both Schueler and Eckert. The jury below found subcontractor Eckert not liable, but found general contractor Schueler liable for the plaintiff's injuries. Schueler appealed.

The appellate court concluded that both Schueler and Eckert owed a duty to the plaintiff. The court carefully scrutinized the facts. Based upon this particular fact situation, however, the court held that the jury's verdict was against the manifest weight of the evidence. The court reasoned that the plaintiff's presence could not be reasonably foreseeable to Schueler but not reasonably foreseeable to Eckert. In reversing the trial court, the appellate court stated that "finding liability on the part of the general contractor and no liability on the part of the independent contractor was fatuous, unrealistic and resulted in an irresponsible placing of loss on one party." (*Leatherman v. Schueler Brothers, Inc.* (1963), 40 Ill. App. 2d 56, 64, 189 N.E.2d 10.) The appellate court concluded, therefore, that while the general contractor could have been liable here, the jury's verdict was against the manifest weight of the evidence.

Yelnick argues that he is not liable for the acts of independent contractor Summit. Yelnick correctly cites the law in this area. Yelnick, however, misstates the issue. The question is whether Yelnick falls within section 414. The issue is not whether Summit is an independent contractor; that fact is already established. The issue to be determined is whether Yelnick had the right to exercise the amount of control that would make Yelnick vicariously liable under section 414.

In the case at bar, Yelnick accepted Gogan's offer to remodel Gogan's building. Yelnick submitted a written proposal to Gogan that stated that Yelnick would take care of the plumbing, decorating, electrical and carpentry work for $6,750. Furthermore, Yelnick's proposal included the possibility of a new furnace. In the course of the remodeling, Yelnick hired various subcontractors to do different aspects of the work. In fact, Yelnick employed Summit to install a new furnace in Gogan's building.

Yelnick did not follow any detailed professional drawing in performing the construction work. Rather, Yelnick just used a rough sketch of a floor plan that Gogan had drawn. The sketch showed just the basics: the layout of the rooms; the number of rooms; and the size of the rooms. Gogan did not give instructions regarding any of the air conditioning or duct work.

Yelnick would then relay Gogan's general instructions to the subcontractors. Gogan did, at times, talk directly to the subcontractors. Gogan, however, only had brief encounters with the subcontractors. It appears that if Gogan were present during construction, he would give the subcontractors simple instructions such as "move these things over here or put these things there."

Gogan's testimony reveals further that Gogan did not know whether Yelnick was going to do the work himself or hire subcontractors to do it. Gogan was not even aware that it was Summit who had installed the duct work and furnace. Gogan was only familiar with the name of Summit because Gogan had seen its name on the subpoena. In essence, Yelnick had the entire responsibility for the remodeling job. Yelnick apparently was the only person who had extensive conversations with the subcontractors, exercised total control over the subcontractors and made the final decisions as to how things would be done.

Yelnick's proposal to Gogan also states that a permit was included in the total price of the contract. In response to questioning about the permit, Yelnick stated that he did not remember, but assumed that there was a building permit. Surprisingly, Yelnick stated that he never inspected the subcontractors' work because he was not knowledgeable in those areas. Furthermore, Yelnick did not have anyone inspect or did not recall seeing anyone inspect Gogan's building.

Yelnick testified that Gogan paid Yelnick for the entire remodeling job and Yelnick in turn paid each of the subcontractors. Yelnick also testified that if Gogan was unsatisfied with some part of the work and refused to pay the bill, Yelnick would have to do whatever was necessary to correct the problem. Thus, Yelnick was not only responsible for paying the subcontractors, but for correcting any of their errors if Go-

gan refused to pay the bill. Yelnick, however, changes his answer when payment of the bill is not an issue. In the instance where Gogan pays his bill and later calls up to complain to Yelnick about some unsatisfactory work, Yelnick would then tell Gogan to call the appropriate subcontractor to repair the error. According to Yelnick, the subcontractor would correct the error at the subcontractor's own expense.

Yelnick admitted that he offered a one-year warranty/guarantee on his own work. Yelnick explained that his guarantee meant that his work would be done in a "workmanlike manner." It would seem appropriate that since Yelnick was the general contractor, he warrantied the entire remodeling job. Yelnick's testimony makes it clear, however, that he intended the one-year warranty only to apply to the carpentry work.

In the trial record, there is no mention of any contract between Yelnick, as general contractor, and Summit. The absence of a contract, in and of itself, is not conclusive as to whether Yelnick had the right or duty to control Summit's actions. (*Manahan v. Daily News-Tribune* (1977), 50 Ill. App. 3d 9, 14, 365 N.E.2d 1045.) A general contractor "owes a duty to see that adequate protection is furnished persons lawfully upon the premises against injury which might be anticipated as probable consequences of the work of the subcontractors." (*Leatherman v. Schueler Brothers, Inc.* (1963), 40 Ill. App. 2d 56, 61, 189 N.E.2d 10.) If Yelnick has a duty to protect third parties from Summit's actions, it only follows that Yelnick has the right to control Summit accordingly. It is critical to note that it is the employer's right to control and not the exercise of the right that is of primary importance. *Manahan v. Daily News-Tribune* (1977), 50 Ill. App. 3d 9, 14, 365 N.E.2d 1045.

Based on the facts of this case, a genuine issue of material fact exists as to whether the carpentry work that Yelnick performed was a contributing cause of the plaintiffs' injuries. A genuine issue of material fact also exists as to whether Yelnick had a right to exercise the amount of control necessary to hold him liable for Summit's actions under section 414. The trial court erred when it granted summary judgment for Yelnick. The cause is therefore reversed and remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

HARTMAN and BILANDIC, JJ., concur.